**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| MARY ANN SMITH, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Cv. No. 2:13-cv-02016-JPM-tmp |
| v. | ) | Cr. No. 2:10-cr-20113-01-JPM |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER ADDRESSING PENDING MOTION,
DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
DENYING CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion") filed by Movant, Mary Ann Smith, Bureau of Prisons ("BOP") register number 40262-086, who is currently on supervised release (§ 2255 Mot., *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 1)[1] and Smith's motion titled "Motion Waiving Rights To Attorney_Client [sic] Privilelege [sic]" (Mot. Waiving Rights, *id.*, ECF No. 7). For the reasons stated below, the Court DENIES the pending motion and DENIES the § 2255 Motion.

---

[1] According to the BOP's Inmate Locator, Smith was released on October 9, 2015. http://bop.gov/inmateloc/. To date, she has failed to notify the Clerk of her forwarding address.

# I.    PROCEDURAL HISTORY

## A.    Criminal Case Number 10-20113

On March 10, 2010, a federal grand jury returned an indictment against Smith. (Indictment, *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 1 (sealed).)  On May 13, 2010, the grand jury returned a superseding indictment against Smith. (Superseding Indictment, *id.*, ECF No. 5 (sealed).)  On June 24, 2010, the grand jury returned a second superseding indictment against Mary Ann Smith and Michael Lee Smith.  (2d Superseding Indictment, *id.*, ECF No. 11 (sealed).)  The factual basis for the charges against Mary Ann Smith is stated in the presentence report:

> 6.    According to the investigative file, in June 2009, the Bureau of Immigration and Customs Enforcement (ICE) received information about a company named International Business Network (IBN) engaged in what agents suspected might be a fraudulent scam involving student visas.  IBN was owned and operated by Michael and **Mary Ann Smith** in Virginia. Michael Smith was designated the Chief Executive Officer (CEO) and **Mary Ann Smith** was designated the vice president of IBN.  One of the purported purposes of IBN was to assist individuals in obtaining student visas for a fee or set of fees.  An ICE investigation report indicated that IBN claimed to be associated with the United States Citizen and Immigration Service Agency (USCIS).  However, there was no such association between IBN and USCIS.  One of the victims (C. Chhay) received a letter from IBN, on fraudulently created Department of Homeland Security letterhead.  It appears that the fraudulent letter was sent to further the scheme and promote the idea that IBN was affiliated with a legitimate government agency.

> 7.    Subsequent investigation revealed that in February 2009, **Mary Ann Smith** (hereinafter referred to as **Smith**) was contacted by Helen and Samoeun Keo, who live in the Western District of Tennessee, about securing students visas for members of their family in Cambodia.  On February 4, 2009, **Smith** sent an email, from outside of the state of Tennessee, to Samoeun Keo describing a purported student visa program. In the email, **Smith** explained this program by stating "US government wants to learn more about your culture.  Every student that we bring to the US, the government is sending one to your country in exchange of you coming" [sic].

8.    The email stated that the Keo's relatives would obtain student visas that would be valid for five years, during that period of time the student would not be able to leave the United States.  **Smith** indicated that after the initial five years, the visa holder's immigration status would be adjusted to permanent resident and he/she would receive a green card.  The email further stated that IBN would apply for this program on behalf of the Keo's relatives, for a fee of $6,480 per student, with a processing time of six to eight months.  The fee of $6,480 per student would be for "visa and school requirements" according to **Smith**.

9.    According to the investigative file, this type of student visa program does not exist and student visa holders cannot adjust to green card status.  Student visas are considered non-immigrant visas that cannot be adjusted to legal permanent resident status.

10.   After receiving the email, the Keos signed contracts with IBN to obtain student visas for four of their relatives.  On or about February 8, 2009, Helen Keo mailed four checks in the amount of $6,480 each from Tennessee to **Smith** in Virginia.

11.   On April 5, 2009, **Smith** sent an email to Samoeun Keo stating that the Keos needed to send her a payment for airline tickets.  **Smith** claimed that USCIS needed proof that airline tickets had been purchased.  However, the USCIS has no such requirement for verification.

12.   On April 6, 2009, **Smith** sent an email to Mr. Keo stating that she received what she called "school confirmation" for the Keo's relatives who were to obtain the student visas.  The schools that **Smith** supposedly received confirmation from were The University of Memphis and Christian Brothers University, both in Memphis, Tennessee.  However, neither school received an application regarding the Keo's relatives.

13.   **Smith** sent another email on April 7, 2009, informing Mr. Keo that the airline tickets for the student visa applicants needed to be from a company "authorized by immigration."  **Smith** further noted that she could purchase the airline tickets for the Keos for $2,186 per ticket.  However, USCIS does not in fact limit the student visa applicant to any specific airline.

14.   On April 10, 2009, an immigration processing fee in the amount of $4,000 was paid in cash to IBN by the Keos.  The invoice was signed by Michael Smith.

15.   On or about April 21, 2009, Mrs. Keo mailed three checks, each in the amount of $2,186, to **Smith**.  Presumably these checks were for the purchase of three airline tickets.  On or about that same day, at **Smith's** instruction, Mrs. Keo sent a wire transfer in the amount of $2,500 via

MoneyGram International Money Transfer, to Jeffrey Tosh, for the purchase of an airline ticket. The wire transfer was sent from Memphis, Tennessee, to Seattle, Washington. Again on May 1, 2009, a wire transfer in the amount of $4,058 via MoneyGram International Money Transfer, was sent to Jeffrey Tosh, for the purchase of additional airline tickets. This wire transfer was sent from Cambodia to Seattle, Washington.

16. On May 16, 2009, **Smith** sent an email to Mr. Keo stating that once the Keos paid for a certain type of insurance that she would inform USCIS that their relatives' documents were complete and ready for processing. However, USCIS places no such insurance requirement for individuals seeking student visas.

17. The Keos became suspicious that **Smith** was not able to obtain the student visas or provide the services that she described to them. Mrs. Keo contacted the United States Embassy in Cambodia. A representative from the Embassy informed Mrs. Keo that they do not deal with visa brokers. Mrs. Keo then sent letters to the offices of Consumer Affairs in Tennessee and Virginia indicating that she had paid **Smith** $43,036 and received nothing in return. Mrs. Keo further indicated that **Smith** was seeking more than $11,000 for medical and health travel insurance in addition to what she had already received. Mrs. Keo also filed a complaint with the Virginia Department of Agriculture and Consumer Services. [In a Victim Impact Statement submitted by Mrs. Keo, she stated that an additional $5,000 was sent to Cambodia to cover fees related to obtaining passports and other documents that **Smith** claimed were necessary for the Visa obtaining process.]

18. In response to Mrs. Keo's complaint, **Smith's** husband and CEO of IBN, sent her a letter stating that IBN had processed and submitted the documents to USCIS and the universities. The Keos indicated that they had received a phone call on May 5, 2009, from a male subject who identified himself as a USCIS employee, confirming that their documents had been submitted. When Mrs. Keo asked the caller for his name and contact information, the employee refused to give her any information and instructed her to call the main number for USCIS. However, ICE investigators later found that the phone call did not originate from USCIS. **Smith** had previously opened an account with a company called *Spoofcard*, which allows account holders to make phone calls that appear to have originated from a phone number of the account holder's choice. *Spoofcard* also allows individuals to disguise their voices, therefore, the phone call that appeared to have come from USCIS in fact came from **Smith**. **Smith** was able to make the call appear as though it was coming from the main phone number for USCIS, which was obtained from the official website (www.uscis.gov).

19. Investigators found that **Smith** also made several *Spoofcard* phone calls to her husband, Michael Smith, posing as an FBI agent. Under the impersonation of an FBI agent, **Smith** told her husband that he was to assist in an investigation of government officials in the Philippines that **Smith** had contact with when she lived there prior to moving to the United States.

20. On September 16, 2009, ICE agents interviewed Stefan Zenker, a German national, who was hired by IBN as an office assistant in February of 2009. Zenker advised agents that **Smith** ran the day-to-day operations of IBN even though Mr. Smith was the CEO. Zenker stated that he became suspicious of IBN's business practices. On one occasion, a client asked **Smith** to hold the check for a future payment of registering a sponsored immigrant at a college or university and **Smith** agreed. However, **Smith** later instructed Zenker to cash the check. Zenker also reported that **Smith** requested a blank check from a client. **Smith** wrote the check for $5,000 and instructed Zenker to cash it. **Smith** explained to Zenker that the client owed her (**Smith**) money and she was anxious to cash the check. The client informed Zenker that an employee from USCIS called and advised him to pay IBN. Zenker stated that he believed that the caller was purposefully and falsely portrayed as a USCIS employee.

21. Zenker advised agents that he had spoken to Mrs. Keo when she called to complain about "nothing happening" with the money she paid to IBN. When Zenker asked **Smith** about Keo, **Smith** told him not to worry and that IBN does not make any guarantees. **Smith** further stated that Keo was simply disappointed because the process did not work out.

22. Prior to Zenker's resignation from IBN, **Smith** contacted Zenker and advised that an envelope would be delivered. **Smith** instructed Zenker not to open the envelope. On June 25, 2009, a Federal Express package (8696 0121 0747) was delivered to lBN and received on June 26, 2009. Zenker contacted the telephone number on the package and spoke with Jeffery Tosh, who advised that he was **Smith's** fiancé. Zenker then opened the package and found a HSBC Bank electronic pin device, which is used to make wire transfers. Zenker took possession of the device and contacted the offices of the Henrico Police Department, the Virginia Bureau of Investigations, and the Federal Bureau of Investigations.

23. Following **Smith's** indictment (June 2010), she told ICE agents that her husband was a certified immigration consultant and the [sic] he taught her (**Smith**) how to handle the immigration documents. **Smith** also informed agents that she and her husband traveled to Cambodia and the Philippines to teach people how to complete the immigration paperwork. In the Spring of 2011, **Smith** made additional statements admitting her guilt and expressing that although her husband was the CEO of IBN, he was

unaware that she was not actually processing the immigration documents. **Smith** further stated that her husband wrote letters to the Virginia Department of Agriculture and Consumer Services in reply to the Keos['] complaints only after she (**Smith**) assured him that the documents had been submitted.

24.    **Smith** admitted to orchestrating the fraud scheme and to directing both her husband and at least one IBN employee in carrying out the scheme.

25.    Information found in the investigative file indicated 34 victims in this case. . . .

26.    According to the investigative file, the total financial loss was **$359,270.00**.

(PSR ¶¶ 4-26.)

Counts 1 through 6 of the Second Superseding Indictment charged Mary Ann Smith and Michael Lee Smith with using wire communications for the purpose of executing a scheme or artifice to defraud, in violation of 18 U.S.C. § 1343. Specifically, Count 1 charged that, on February 4, 2009, Mary Ann Smith sent an email to S.K. describing the supposed student visa program and the fee of $6,480 per applicant. Count 2 charged that, on April 5, 2009, Mary Ann Smith sent an email to S.K. stating that immigration needed proof that the student visa applicants had airline tickets. Count 3 charged that, on April 6, 2009, Mary Ann Smith sent an email to S.K. advising that she was able to get "school confirmations" for the four applicants S.K. and H.K. were sponsoring. Count 4 charged that, on April 7, 2009, Mary Ann Smith sent an email to S.K. stating that the student visa applicants needed plane tickets from a company authorized by "immigration." Count 5 charged that, on April 21, 2009, Mary Ann Smith and Michael Lee Smith caused H.K. to send $2,500 from Memphis, Tennessee to Seattle, Washington via MoneyGram International Money Transfer for the purpose of purchasing airline tickets for their relatives. Count 6 charged that, on May 16, 2009, Mary Ann Smith sent an email to S.K. stating

that, once S.K. and H.K. had paid for insurance, IBN would inform "immigration" that their relatives' documents were ready.

Counts 7 through 10 of the Second Superseding Indictment charged that Mary Ann Smith and Michael Lee Smith, aided and abetted by each other, for the purpose of executing their scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, caused several items to be delivered by mail, in violation of 18 U.S.C. § 1341. Specifically, Count 7 charges that, on February 8, 2009, the defendants caused H.K. to send to IBN via United States mail four checks, each in the amount of $6,480. Count 8 charges that, on April 21, 2009, the defendants caused H.K. to send to Mary Ann Smith via United States mail three checks, each in the amount of $2,186. Counts 9 and 10 charge that, on August 13, 2009, Michael Lee Smith mailed documents to H.K. (Count 9) and to S.K. (Count 10) claiming that all of the immigration documents had been submitted to immigration.

The Second Superseding Indictment also included a criminal forfeiture count.

Pursuant to a written Plea Agreement, Mary Ann Smith appeared before the Court on June 17, 2011, to plead guilty to Counts 1 and 7 of the Second Superseding Indictment. (Min. Entry, *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 70; Plea Agreement, *id.*, ECF No. 73; Change of Plea Hr'g Tr., *id.*, ECF No. 97.) At a sentencing hearing on November 15, 2011, the Government presented the victim impact testimony of Helen Keo. (Min. Entry, *id.*, ECF No. 88; 11/15/2011 Sentencing Hr'g Tr., *id.*, ECF No. 98.) The sentencing hearing continued on December 8, 2011, at which time the Court sentenced Mary Ann Smith to a term of imprisonment of seventy-two months, to be followed by a three-year period of supervised release. Smith was also ordered to make restitution in the amount of $238,302.50.

(Min. Entry, *id.*, ECF No. 90; 12/08/2011 Sentencing Hr'g Tr., *id.*, ECF No. 94.)[2]  Judgment was

entered on December 12, 2011.  (J. in a Criminal Case, *United States v. Smith*, No. 2:10-cr-

20113-01-JPM (W.D. Tenn.), ECF No. 91 (sealed).)  Smith did not take a direct appeal, having

waived the right to do so.

**B.     Case Number 13-2016**

On January 7, 2013, Smith filed her *pro se* § 2255 Motion, which raised the following

issues:

1.     "Plea Agreement Phase" (§ 2255 Mot. at PageID 4, *Smith v. United States*,

No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 1);

2.     "Pre-Sentence Report" (*id.* at PageID 5);

3.     "Failure to Present any Mitigating Factor in the PSI" (*id.* at PageID 7); and

4.     "Court added 2 point variance under the victim vulnerability provision"

(*id.* at PageID 8).

The Court issued an order on June 11, 2014, that, *inter alia*, directed the Government to

respond to the § 2255 Motion.  (Order, *id.*, ECF No. 2.)  The Government filed its Response of

the United States to Defendant's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28

---

[2] The 2011 edition of the *Guidelines Manual* was used to calculate Smith's sentencing range.  (PSR ¶ 42.)  Pursuant to § 3D1.2(d) of the United States Sentencing Guidelines, the counts of conviction were grouped because the offense level is determined largely on the basis of the total harm or loss.  The base offense level for fraud and deceit is 7 where the defendant was convicted of an offense referenced in that guideline that had a statutory maximum term of imprisonment of 20 years or more.  U.S.S.G. § 2B1.1(a)(1).  Smith received a twelve-point enhancement because the loss was more than $200,000 and less than $400,000, *id.* § 2B1.1(b)(1)(G), a two-point enhancement because the offense involved ten or more victims, *id.* § 2B1.1(b)(2)(A)(i), a two-point enhancement because the offense involved a misrepresentation that the defendant was acting on behalf of a government agency, *id.* § 2B1.1(b)(9)(A), a two-point enhancement because Smith was an organizer, leader, manager or supervisor, *id.* § 3B1.1(c), and a three-point reduction for acceptance of responsibility, *id.* § 3E1.1, resulting in a total offense level of 22.  Given her criminal history category of I, the advisory sentencing range was 41-51 months.

U.S.C. § 2255 ("Answer") on August 8, 2014.  (Answer, *id.*, ECF No. 6.)[3]  Smith did not file a reply.

On August 29, 2014, Smith filed a document, titled "Motion Waiving Rights to Attorney_Client [sic] Privilelege [sic]."  (Mot. Waiving Rights, *Smith v. United States,* No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 7.)  The Government did not respond to this motion.

**C.      The Pending Motion (ECF No. 7)**

In her "Motion Waiving Rights to Attorney_Client [sic] Privilelege [sic]," Smith states that she releases her former attorneys from the attorney-client privilege and asks that the following information be provided to the Court:

> 1.      That all conversations that took place between the petitioner and counsels, Mr. Arthur Horne and Murray Wells, not only on or about June 10, 2011, but **ALL** conversations recorded should be submitted to this Court.
>
> 2.      That all letters and written communications sent by petitioner to counsels shall be given to Court.
>
> 3.      That all records of conversations during the couple of visits by the counsels to the petitioner should be submitted to court.
>
> 4.      That all telephone messages left in the voicemailbox [sic] of the counsels by the petitioner if still available should be submitted to Court.
>
> 5.      **ALL or any** investigative work, historical records, depositions, comprehensive litigation work (if any) done by the counsel in [sic] behalf of the petitioner should be submitted to court.

(*Id.* at 1.)

---

[3] On August 4, 2014, five days before its answer was due, the Government filed a Motion to Release Trial Counsel from Attorney Client Privilege.  (Mot. to Release Defense Counsel from Attorney Client Privilege, *United States v. Smith*, No. 2:10-cr-20113-JPM (W.D. Tenn.), ECF No. 99.)  Although the filing bears the docket number of both the criminal and civil cases, it was filed only in the criminal case.  The Court granted the motion on August 11, 2014.  (Order, *id.*, ECF No. 100.)  By that time, the Government had filed its Answer, which did not include an attorney affidavit.

Smith's request that her attorneys cooperate with the Government is moot because the Court has already directed counsel to do so. (Order, *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 100.)[4]

Smith's request that her attorneys submit the listed documents is, in effect, a request for discovery. Habeas petitioners and § 2255 movants do not have an automatic right to discovery. *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009). Discovery in § 2255 cases is controlled by Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules"), which states that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(b) provides, in part, that "[a] party requesting discovery must provide reasons for the request." *See Cornwell v. Bradshaw*, 559 F.3d 398, 410 (6th Cir. 2009) ("For good cause shown, the district court has the discretion to permit discovery in a *habeas* proceeding"). Rule 6 is meant to be "consistent" with the Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969). *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). Thus,

> where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.

*Harris*, 394 U.S. at 300.

"Good cause" is not demonstrated by "bald assertions" or "conclusory allegations." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001); *see also Williams v. Bagley*, 380 F.3d 932,

---

[4] That the Government sought and obtained a limited waiver of Smith's attorney-client privilege does not obligate it to submit a factual affidavit from counsel. The Government has submitted an Answer that argues that Smith's claims are meritless and do not warrant an evidentiary hearing. The Court has not ordered the Government to submit a factual affidavit from counsel because the issues presented can be resolved without an affidavit.

974 (6th Cir. 2004) (same). Rather, the requested discovery must be materially related to claims raised in the habeas petition and be likely to "resolve any factual disputes that could entitle [the petitioner] to relief." *Williams*, 380 F.3d at 975 (citation and internal quotation marks omitted); *see Bracy*, 520 U.S. at 908-09 (allowing discovery relevant to "specific allegations" of fact in support of a claim of constitutional error); *Post v. Bradshaw*, 621 F.3d 406, 425 (6th Cir. 2010) (discovery provides petitioner "that extra evidence" he needs to prove or strengthen his case); *Braden v. Bagley*, No. 2:04-CV-842, 2007 WL 1026454, at *2 (S.D. Ohio Mar. 30, 2007) ("Rule 6's 'good cause' standard requires petitioner to at least attempt to identify what he expects to uncover through his discovery requests."). Rule 6(a) does not permit a "fishing expedition masquerading as discovery." *Stanford*, 266 F.3d at 460.

Smith has not shown good cause for the discovery she seeks. She has not explained what she hopes to learn from the information that is sought. Smith made no effort to tie her requests to specific claims in her § 2255 Motion. The Motion is DENIED.

## II.        THE LEGAL STANDARDS

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

*Id.*

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), § 2255 Rules. "If the motion is not dismissed, the judge must order the United States attorney to file an answer,

motion, or other response within a fixed time, or to take other action the judge may order." *Id.* The movant is entitled to reply to the Government's response. Rule 5(d), § 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted). "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotation marks omitted). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ."). The movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

## III.  ANALYSIS OF MOVANT'S CLAIMS

### A.  The Alleged Ineffective Assistance of Counsel Regarding the Plea Agreement (Claim 1)

In Claim 1, titled "Plea Agreement Phase," Smith argues that

I was misled by my lawyer, Arthur Horne and his partner Mr. Murray Wells. Mr. Horne told me I would only get 24-36 months. Maximum of 36 months. Mr. Horne said it is an open plea agreement but with my criminal history he is sure that I could only get 36 months maximum.

(§ 2255 Mot. at PageID 4, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 1.) Smith provides further detail in an unsigned attachment to her § 2255 Motion, titled "Motion." (Attachment to § 2255 Mot. at PageID 15-16, *id.*, ECF No. 1-1.)[5]

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citations and internal quotation marks omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[6] "A reasonable probability is a probability sufficient to undermine

---

[5] The Government argues that Claim 1 is barred by the waiver in ¶ 1(d) of the Plea Agreement (Answer at 10, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 6), which provides that,

> except with respect to claims of ineffective assistance of counsel or prosecutorial misconduct, she waives her rights to challenge the voluntariness of her guilty plea on direct appeal or in any collateral attack. She otherwise knowingly, intelligently and voluntarily waives any rights to an appeal of her conviction or sentence in this case[.]

Plea Agreement ¶ 1(d), *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 73.) The Government is mistaken. Smith is presenting a claim of ineffective assistance of counsel, which falls outside the waiver.

[6] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . ." *Id.* at 697. If a reviewing court finds a

confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (citations and internal quotation marks); *see also id.* at 112 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The two-part test stated in *Strickland* applies to challenges to guilty pleas based on the ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985). "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id.* at 56 (internal quotation marks omitted). "[T]o satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59; *see also Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) ("[T]o obtain relief on this type of claim, a [prisoner] must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.").[7] A

---

lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

[7] The Supreme Court emphasized that,

prisoner "cannot make that showing merely by telling [the court] now that she would have gone to trial then if she had gotten different advice.  The test is objective, not subjective . . . ."  *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012).  The Supreme Court also emphasized that "it is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland*'s prejudice prong."  *Padilla*, 559 U.S. at 371 n.12.

Smith cannot establish either deficient performance or prejudice.  In the Plea Agreement, Smith agreed that "she is pleading guilty freely and voluntarily, and not under duress or threat of coercion, after having consulted with counsel, because she is guilty[.]"  (Plea Agreement ¶ 1(b), *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 73.)  At the change of plea hearing, the Government described, at length, the facts it would have proven had the case gone to trial.  (Change of Plea Hr'g Tr. 39-45, *id.*, ECF No. 97.)  That proof included statements Smith had made to investigators during the Spring of 2011 in which "she admitted her guilt of the charges against her and stated that although her husband was the president of International Business Network, he was unaware that she was not actually processing documents and sending them to Citizen and Immigration Services as she had led him to believe she was."  (*Id.* at 44-45.)  In light of these admissions by Smith, it is difficult to imagine any reasonable alternative to a

---

[i]n many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than going to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill*, 474 U.S. at 59.

16

guilty plea in this case. Smith's sentencing range under the Plea Agreement is lower than the range she would have faced had she been convicted after a trial. In that case, Smith would not have received the reduction for acceptance of responsibility, leaving her with a total offense level of 25 and a sentencing range of 57-71 months. The Court may well have sentenced Smith above the guideline range, and above the 72-month sentence that was imposed, for the reasons stated at the sentencing hearing.

The Court also rejects Smith's contention that she pled guilty under the mistaken belief that the maximum sentence she could receive was 36 months. The Plea Agreement provides that Smith "acknowledges that she has been advised and does fully understand the following: (a) The nature of the charges to which the plea is offered and the maximum possible penalty provided by law[.]" (Plea Agreement ¶ 2(a), *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 73.) At the change of plea hearing, the Court advised Smith that the maximum penalty for each offense was twenty years. (Change of Plea Hr'g Tr. 16, *id.*, ECF No. 97.) Smith testified that she had discussed the advisory guideline range with her attorney. (*Id.* at 17.) She understood that the sentence that was ultimately imposed might be different from any estimate her attorney had provided. (*Id.*) She also understood that the Court had the authority to depart upward or downward from the advisory guideline range. (*Id.* at 17-18.) Smith acknowledged that the Court would examine other statutory sentencing factors, including the factors in 18 U.S.C. § 3553(a), to determine whether it would be appropriate to depart from the guideline range. (*Id.* at 18.) Regardless of what defense counsel may or may not have told her, Smith was aware when she entered her guilty plea of the possibility that she might be sentenced up to twenty years on each count of conviction. Smith also did not allege that, if only she had known that she could have received a 72-month sentence, there is a reasonable probability that

she would have foregone a guilty plea and insisted on going to trial. *See Swain v. United States*, 155 F. App'x 827, 832 (6th Cir. 2005) (finding that movant did not satisfy her burden of demonstrating that she would have withdrawn her guilty plea). Smith did not move to withdraw her guilty plea when she received the PSR and saw that the guideline calculations exceeded the sentencing range of 24 to 36 months that her attorney allegedly had given her. Accordingly, she suffered no prejudice from counsel's allegedly erroneous advice.

Claim 1 is without merit and is DISMISSED.

### B.    Counsel's Alleged Failure to Object to the Amount of Restitution (Claim 2)

In Claim 2, titled "Pre-Sentence Report," Smith alleges that

> [m]y PSI was given to me [a] few days before sentencing. I raised my concerns regarding restitution and I told my lawyer that I want it corrected. There were 12 people who claimed I took money from them and a total of $128,444.00 which is beyond the amount[.] My lawyer told me to "keep my mouth shut" and the judge won't believe me. He said the judge will give me more years if I will questioned [sic] the PSI and the judge will never believe me. He also will take my points for acceptance of responsibility.

(§ 2255 Mot. at PageID 5, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 1.) In her unsigned attachment to the § 2255 Motion, Smith alleged that,

> [w]hen I got sentenced, Mr. Horne did not fight for me. He did not fight about the amount [of the] loss. I am willing to take responsibility of my actions. I also told Mr. Horne that I want to pay restitution and I am writing a book. I wrote Mr. Horne a letter detailing my desire to do this. And I want the proceeds to go to the people that I owe money to. But, the PSI has to be corrected. Because there are so many people who said I owe them when in fact, I don't. Mr. Horne told me, that even if I question this, the government won't believe me. He said it is futile for me to correct it. He said "Don't worry, you won't pay it anyway, because you will be deported". He also told me that the Judge will believe the people who claim I owe them money than listening to me. Where is fairness?. [sic] I took responsibility of my actions and I am truly sorry of what happened but the system does not believe me. Even my Lawyer said that. Here are the list of people that claimed to have lost money when in fact, I never gotten any from them:
>
> 1.    Aissatu Jalloh—$3,425.00
> 2.    Beatrice Mansfield—$2,000.00

3.     David Cooper—$2,705.00
       4.     Hen Roth—$5,000.00
       5.     Jamelia Ali—$2,770.00
       6.     Khan Moeun—$15,000.00
       7.     Oum Moeum—$15,000.00
       8.     Path Bosophanny—$15,000.00
       9.     Saluma Faray Daye—$3,540.00
       10.    Samnang Roth—$45,000.00
       11.    Tatiana Fetgo—$4,000.00
       12.    Trease Settro—$15,000.00

       This is not just a difference of $10,000 or $20,000.00. The result of this re-
       computation will change the result of my sentence. My failure to raise the
       restitution issue at sentencing is attributable to Mr. Horne's reluctance to "rock
       the boat" because he said he wanted the court to see me as cooperative and
       contrite.

(Attachment at PageID 16, *id.*, ECF No. 1-1.) The total of the amount of restitution that Smith

claims was wrongly assessed is $128,350.[8]

       A claim that counsel rendered ineffective assistance with respect to the amount of

restitution is cognizable in a § 2255 motion. *Weinberger v. United States*, 268 F.3d 346, 351-52

(6th Cir. 2001); *United States v. Riddell*, Criminal Action No. 07-98-JBC-1, 2012 WL 728337, at

*2 (E.D. Ky. Jan. 24, 2012), *report and recommendation adopted*, 2012 WL 729265 (E.D. Ky.

Mar. 6, 2012). In ordering restitution for the loss of a victim's money, the amount of restitution

is equal to the victim's monetary loss. 18 U.S.C. § 3663A(b)(1)(B). The victim may also be

compensated for "lost income and necessary child care, transportation, and other expenses

incurred during participation in the investigation or prosecution of the offense or attendance at

proceedings related to the offense." *Id.* § 3663A(b)(4). A "victim" is "a person directly and

proximately harmed as a result of the commission of an offense for which restitution may be

_____

       [8] The Government claims, as an initial matter, that Claim 2 is barred by Smith's waiver of
the right to challenge her sentence. (Answer at 13, *id.*, ECF No. 6.) The Government is
mistaken. The waiver does not encompass a claim that counsel rendered ineffective assistance at
the sentencing hearing. *See supra* p. 14 n.5.

ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct . . . ." 18 U.S.C. § 3663A(a)(2). To aid the court in fashioning a restitution award, "the probation officer [shall] obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim . . . ."[9] 18 U.S.C. § 3664(a). "After reviewing the report of the probation officer, the court may require additional documentation or hear testimony." *Id.* § 3664(d)(4).

"In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses . . . ." 18 U.S.C. § 3664(f)(1)(A); *see also* U.S.S.G. § 5E1.1(a)(1)-(2) (a restitution order should be "for the full amount of the victim's loss"). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). "Although the [Mandatory Victims Restitution Act ("MVRA")] does not require courts to calculate restitution with *exact* precision, *some* precision is required—speculation and rough justice are not permitted." *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015)

---

[9] *See* Paragraph 96 of the Presentence Report, which states:

Restitution is mandatory pursuant to 18 U.S.C. § 3663A. It appears that restitution in the amount of $238,302.50 is owed to Alice Falika-Smith, Ben and Sara Lamouth, Chheang Chhay and Sariv Khiev, Florence Boakai-Payne & Alfred Zaccheus Payne, Helen and Samoeun Keo, Hen Roth, Khan Moeun, Min Neil and Careb Long, Momodu Kromah, Oum Moeun, and Sothiary and My Neil. Additional restitution information may be forthcoming.

This amount was not challenged and was accepted by the Court. (*See* 12/08/2011 Sentencing Hr'g Tr. 5, 36, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 94; *id.* at 27-28 ("[T]he restitution amount is the amount that we would have been able to verify . . . ."); *id.* at 47 (no objections).)

(alteration and internal quotation marks omitted). The Court is entitled to rely on estimates of a victim's losses. *United States v. Matos*, 611 F.3d 31, 45 (1st Cir. 2010) ("Though it might have been preferable for the district court to explain how it arrived at the restitution figure of $350,000 in Matos's case, we have held that absolute precision is not required in calculating restitution under the MVRA, and that only a modicum of reliable evidence is required to establish a restitution award." (internal quotation marks omitted)); *United States v. Smiley*, 553 F.3d 1137, 1146 (8th Cir. 2009) (district court did not err in relying on the testimony of a postal inspector who had accepted the victims' testimony without conducting his own investigation).

In its Answer, the Government expends much effort trying to establish that the loss calculations in the PSR for the twelve listed individuals were plainly supported by cancelled checks or by other evidence. (Answer at 13-14, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 6.)[10] The Government, however, overlooks the fact that, although the PSR calculated the total loss as $358,270 (PSR ¶ 29), the amount of restitution that was awarded was only $238,302.50 (J. in a Criminal Case at 5-6, *United States v. Smith,* No. 2:10-cr-

---

[10] For example, Aissatu Jalloh claimed a loss of $3,425.00. The discovery included copies of two checks from Jalloh made payment to IBN, Inc. One check, dated March 6, 2009, was for $2,200.00 (Ex. B019, id., ECF No. 6-3 at PageID 121), and the second, dated March 17, 2009, was in the amount of $1,225.00 (Ex. B018, id., ECF No. 6-3 at PageID 120).

Beatrice Mansfield claimed a loss of $2,000.00. The discovery included a check in the amount of $2,000.00 from Mansfield to IBN, Inc. (Ex. B037, *id.*, ECF No. 6-4 at PageID 139.)

David Cooper claimed a loss of $2,705.00. The discovery includes three checks from Cooper: one, dated February 28, 2009, in the amount of $1,705.00 (Ex. B013, *id.*, ECF No. 6-3 at PageID 115); a second, dated March 1, 2009, in the amount of $300.00 (Ex. B014, *id.*, ECF No. 6-3 at PageID 116); and a third, dated April 22, 2009, in the amount of $234.00 (Ex. B012, *id.*, ECF No. 6-3 at PageID 114), for a total of $2,239.00. The loss figure for David Cooper might be overstated by $466.00. ($2,705.00 – $1,705.00 – $300.00 – $234.00 = $466.00.) The Government has not explained that discrepancy.

Jamelia Ali claimed a loss of $2,770.00. The discovery includes a check from Jemelia Ali to IBN, Inc., dated March 3, 2009, in the amount of $2,770.00. (Ex. B001, *id.*, ECF No. 6-3 at PageID 103.)

20113-01-JPM (W.D. Tenn.), ECF No. 91 (sealed).)[11] The Court did not order restitution to nine of the twelve individuals identified in Smith's § 2255 Motion.[12] Of the persons listed in Smith's § 2255 Motion, only Hen Roth, Khan Moeun and Oum Moeun were awarded restitution. The total amount of restitution awarded to those three victims was $35,000. (*See* J. in a Criminal Case at 5-6, *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 91.)

Oum Moeun claimed a loss in the amount of $15,000. The discovery reflects three checks from Moeun to IBN, Inc.: the first, dated February 10, 2009, in the amount of $5,670.00 (Ex. B058, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 6-4 at PageID 160); the second, dated February 11, 2009, in the amount of $5,670.00 (Ex. B059, *id.*, ECF No. 6-4 at PageID 161); and the third, dated April 24, 2009, in the amount of $2,750.00 (Ex. B057, *id.*, ECF No. 6-4 at PageID 159), for a total of $14,090.00.

Although defense counsel could have challenged the amount of loss as to Hen Roth and Khan Moeun, and as to the final $910 to Oum Moeun, Smith claimed that her attorney advised her that it would not have been in her best interest to do so because she risked loss of acceptance of responsibility if the Court did not believe her and because it was likely that she would never pay the restitution because she would be deported after service of her sentence. That advice is

---

[11] At the sentencing hearing, the Court noted that "the total numbers in connection with monies submitted appear to have been closer to $348,000, but the restitution amount is the amount that we would have been able to verify and can be ordered to be paid . . . ." (12/08/2011 Sentencing Hr'g Tr. 27-28, *id.*, ECF No. 94.)

For reasons that are not explained, although the PSR calculates the total financial loss at $359,270, the amount of loss listed in Worksheet A, which sets forth the guideline calculations, is $262,632.50. It does not matter which figure was used in the guideline calculations because Smith received an enhancement for a loss between $200,000 and $400,000. U.S.S.G. § 2B1.1(b)(1)(G).

[12] The Judgment reflects that Smith was not ordered to pay restitution to Aissatu Jalloh, Beatrice Mansfield, David Cooper, Jamelia Ali, Path Bosophanny, Saluma Faray Daye, Samnang Roth, Tatiana Fetgo or Trease Settro. (*See* J. in a Criminal Case at 5-6, *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 91.)

professionally reasonable.  If Smith had challenged these loss amounts, the Court would have held a hearing on the amount of restitution at which the victims could be called to testify and other evidence could be introduced to prove the amount of loss.  After hearing the devastating testimony of Helen Keo at the hearing on November 15, 2011, it was entirely reasonable for defense counsel to conclude that Smith would not be well served by the testimony of additional victims.

The Victim Impact Statements in the PSR outline the testimony that could have been expected had the Court ordered an evidentiary hearing.  The Government also had additional evidence that was not included in the PSR but that could have been presented at a hearing.  For example, Hen Roth claimed a loss of $5,000.00.  The Government states that,

> [t]hough there was no specific documentation to support Hen Roth's claim of a $5,000 loss, Petitioner *did* make spoofcard calls to the Roths, posing as Immigration Officer Reyes.  In the calls, Petitioner (posing as "Immigration Officer Reyes") told the Roths their petitions had been approved and they needed to buy insurance.  Based on Petitioner's pattern, they would not have reached the insurance stage of the scam without having made "immigration processing" and other "professional" fees.

(Answer at 14 n.6, *id.*, ECF No. 6.)  Roth submitted a Victim Impact Statement, which provided as follows:

> It has caused stressed between me and my spouse.  Messed up my financial savings [sic].

> Fraud of identity.  Used Id to open phone Account.  And purchase items from Best Buy ($13,000).  Took $5,000 from me.  The money was to be used to petition my family in-laws [sic].

> The money was to be used for petition families to come overseas to live in the United States [sic].

(PSR ¶ 33.)

Khan Moeun claimed a loss in the amount of $15,000, which he paid to IBN for immigration processing. Khan Moeun submitted a Victim Impact Statement that provided as follows:

> The crime has caused the victim, a single parent, financial devastation for his children and himself. As well as having produced embarrassment, humiliation and other mental infirmities. Which impacts on his concentration, memory, judgement, understanding, etc. those impacted consequences is continuing to ruin his life and to tolarable quality [sic].

> The victim, Khan Moeun, paid to the defendant, Mary Ann Smith, and her business $15,000 based upon the defendant's promise that her firm could be more expeditious, than other firms and law offices, in having applications processed. And get 10 family members immigration more in a shorter time frame [sic].

> The defendant T/A IBN, Inc., defrauded the victim by falsely promising him that she (business) could be more expeditious in having USCIS speedily process the necessary forms and immigrate in family into USA. And faster than other lawyers and firms [sic].

(*Id.* ¶ 35.)

Oum Moeun was awarded restitution in the amount of $15,000. As previously noted, the discovery included his checks to IBN, Inc. in the total amount of $14,090. *See supra* p. 22. He also submitted a Victim Impact Statement which stated as follows:

> The loss of $15,000 has caused financial disputes within the victim's family; and embarrassment and humiliation before friends. By having to borrow money from them. The whole eppisode has left the victim severally in mental distress. And, also, his family [sic].

> This victim and his son (Khan Moeun) paid a total of $30,000.00 to the defendant's business. $15,000.00, half of that total was defrauded by the herein defendant. The victim's son, Khan Moeun, is filing a separate claim [sic].

> The defendant, through her business firm, defrauded the victim's family out of $30,000.00 and the victim, personally, out of $15,000.00 by promising "expeditious" processing and immigration of family members [sic].

(PSR ¶ 39.)

The Court finds that Smith has not demonstrated that her attorney's performance was deficient, or that she suffered any prejudice, arising from the failure to challenge restitution amounts to the twelve individuals mentioned in the § 2255 Motion.

Although the § 2255 Motion presents Claim 2 as a challenge to the amount of restitution that was imposed, the Government construes Smith's argument as a challenge to her guidelines calculations. (Answer at 13 n.5, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 6.) If the Court were to accept the Government's position and construe the § 2255 Motion as a challenge to the loss amount and her resulting sentencing range, Smith could not establish either deficient performance or prejudice. Based on the uncontested loss amounts in the PSR and the challenged amounts for which checks are available, Smith would still have received a twelve-point enhancement under U.S.S.G. § 2B1.1(b)(1)(G) for a loss between $200,000 and $400,000. Even if the twelve victims named by Smith were disregarded, Smith also would still have received a two-point enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims. At most, then, a smaller number of victims and a smaller loss might have influenced the Court's analysis of the amount of any upward departure that might be appropriate. That possible benefit would be more than offset, however, by the live testimony of Hen Roth, Khan Moeun and Oum Meoun about the amount of their losses and the effect that Smith's fraud has had on their lives.

Claim 2 is without merit and is DISMISSED.

## C.  Counsel's Failure to Present Mitigating Evidence (Claim 3)

In Claim 3, titled "Failure to Present any Mitigating Factor in the PSI," Smith states that, "[d]uring sentencing, the judge confirmed or stated that 'something is going on there' and he is not an expert, not a psychologist nor a psychiatrist to be able to tell what happened to me. My

lawyer never presented to court any mitigating factor regarding my mental state." (§ 2255 Mot. at PageID 7, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 1.) In her unsigned attachment, Smith complains that her lawyer "never requested any mental evaluation for me that would be able to help the court understand my situation better." (Attachment at PageID 17, *id.*, ECF No. 1-1.)

Smith has not satisfied her burden of demonstrating that her attorney's performance was deficient or that she suffered any prejudice. The circumstances under which a departure is warranted for mental or emotional conditions are limited. U.S.S.G. § 5H1.3 provides, in pertinent part, that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." The suggestion that Smith might suffer from a mental or emotional condition that contributed to the offense is entirely speculative. The PSR states that "[t]he defendant is reportedly speaking to the psychologist at the West Tennessee Detention Facility and does not feel the need for any additional treatment." (PSR ¶ 70.) Smith also reported no gambling issues. (*Id.* ¶ 71.) In the absence of any allegation that an investigation would have uncovered useful evidence that would have been reasonably likely to have resulted in a lower sentence, Smith cannot establish either deficient performance or prejudice.

Claim 3 is without merit and is DISMISSED.

### D.     The Upward Departure from the Guideline Range (Claim 4)

In Claim 4, titled "Court added 2 point variance under the victim vulnerability provision," Smith argued that

> [t]he judge increased a 2-point variance due to vulnerability of the victims. There
> was no evidence presented that the victims were vulnerable. The names given or

> mentioned in PSI did not mention any information about age, nationality, race or infirmities. The judge consider[ed] them to be vulnerable and raise[d] 2 points without considering the vulnerability provision.

(§ 2255 Mot. at PageID 8, *Smith v. United States*, No. 2:13-cv-02016-JPM-tmp (W.D. Tenn.), ECF No. 1.) In her unsigned attachment, Smith discussed U.S.S.G. § 3A1.1 and stated that "there was no proof that there was a targeted group of vulnerable individuals. Since the Judge said that, they came from Southeast Asian Origin, that does not qualify them to be vulnerable victims." (Attachment at PageID 18, *id.*, ECF No. 1-1.)

"Sentencing challenges generally cannot be made for the first time in a post-conviction § 2255 motion. Normally, sentencing challenges must be made on direct appeal or they are waived." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citation omitted); *see also O'Neil v. United States*, No. 92-2455, 1993 WL 157361, at *1 (6th Cir. May 13, 1993) (same). Ordinarily, then, Claim 4 would be barred by procedural default due to Smith's failure to raise the issue on direct appeal.

In the instant matter, Smith presumably failed to take a direct appeal because ¶ 1(d) of the Plea Agreement barred her from appealing her sentence. An appeal waiver is binding if it is made knowingly and voluntarily. *E.g.*, *United States v. Ashe*, 47 F.3d 770, 775-76 (6th Cir. 1995). At the change of plea hearing, Smith acknowledged that she was waiving her right to appeal the sentence that was imposed. (Change of Plea Hr'g Tr. 18-19, *United States v. Smith*, No. 2:10-cr-20113-01-JPM (W.D. Tenn.), ECF No. 97.) The Court found that Smith's waiver of her appeal rights was knowing and voluntary. (*Id.* at 19.) Smith is, therefore, bound by her appeal waiver.

The appeal waiver provision in the Plea Agreement does not provide cause to excuse Smith's procedural default. The Sixth Circuit has held that an appeal waiver provision in a plea

agreement bars review in a § 2255 motion or § 2241 petition of issues required to be raised on direct appeal. *Rivera v. Warden, FCI, Elkton*, 27 F. App'x 511, 515 (6th Cir. 2001).

Claim 4 is without merit and is DISMISSED.

\* \* \* \*

Because Smith is not entitled to relief on any of the issues raised in her § 2255 Motion, the Court DENIES the § 2255 Motion. Judgment shall be entered for the United States.

## IV.        APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing. 28 U.S.C. § 2253(c)(2) & (3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citation and internal quotation marks omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

There can be no question that the issues raised in Movant's § 2255 Motion are meritless for the reasons previously stated. Because any appeal by Movant on the issues raised in her § 2255 Motion does not deserve attention, the Court DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Kincade*, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is DENIED.[13]

IT IS SO ORDERED this 9th day of November, 2015.

/s/ Jon Phipps McCalla
JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE

---

[13] If Movant files a notice of appeal, she must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days.